1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

TIMOTHY JONES,

                    Plaintiff,

          vs.

COUNTY OF SAN
BERNARDINO, et al.,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. EDCV 15-00080-DTB

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

          After the parties waived trial by jury, the Court conducted a four-day bench trial in this matter.  The Court took the matter under submission at the conclusion of trial.[1]  Having considered all the evidence presented by the parties, the written submissions from both sides, and the arguments of counsel, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[2]

/ / /

---

          [1]     The Court has issued its findings of fact and conclusions of law as expeditiously as possible in light of a delay in receiving the Reporter's Transcript of Court Trial Proceedings ["RT"].

          [2]     Any finding of fact that constitutes a conclusion of law should be treated as such, and any conclusion of law that constitutes a finding of fact should be treated as such.

# FINDINGS OF FACT

## I.   The Parties

1. On February 2, 2014, plaintiff Timothy Jones ("Jones") was a pretrial detainee incarcerated at the Central Detention Center ("CDC") in San Bernardino County, California. (See Dkt. No. 49, Admitted Fact ["AF"] at ¶4; 6/6/16 RT at 132.)

2. Defendant County of San Bernardino (the "County") employed defendant Deputy Laron Taylor ("Taylor") as a correctional officer.   Taylor has approximately 27 years of law enforcement experience and was working at CDC on the date of the incident at issue. (AF at ¶5; 6/7/16 RT at 53-54, 111.) On February 2, 2014, Taylor was acting under color of state law and in his capacity as a San Bernardino County sheriff's deputy. (AF at ¶5.)

3. Defendant Sheriff John McMahon ("McMahon") is the chief policymaker for the San Bernardino County Sheriff's Department and is ultimately responsible for establishing and implementing the polices, customs, and practices of the department. (AF at ¶6.)

## II.   Incident on February 2, 2014

4. The chow hall is one of the most dangerous areas at the CDC, particularly because deputies are outnumbered, trays can be used as weapons, and there is only one way in and out of the chow hall.   As such, deputies must take immediate action to resolve any incidents that take place in the chow hall. (See 6/6/16 RT at 140; 6/7/16 RT at 8-9; 6/8/16 RT at 13-14, 162-63, 233, 235-36; 6/15/16 RT at 5-6.)

5. Jones had heard that Richard "Rickie" Wilks ("Wilks") was bullying younger inmates and he did not approve.   Jones sent word to Wilks to "knock that off." Wilks did not listen and Jones issued a fight-on-sight decree. (6/8/16 RT at 56-57, 102-03.)

6.   On February 2, 2014, Wilks, an inmate trustee, was working in the chow hall. (AF at ¶8.)

7.   Jones was one of the first inmates to arrive at lunch.  Upon Jones's arrival, words were exchanged between Jones and Wilks.  (6/8/16 RT at 58-59.)

8.   For safety reasons, inmates in the chow hall are prohibited from communicating with each other.  Inmates are advised when they come to the CDC that no talking is permitted in the chow hall and signs are posted in the chow hall.  (6/6/16 RT at 133-34; 6/8/16 RT at 25-26.)  Both Wilks and Jones were instructed to stop talking.  (6/6/16 RT at 205-06, 221; 6/7/16 RT at 73-74.)

9.   During lunch, Wilks was walking around the chow hall with a pitcher of water in each hand, filling pitchers on the tables.  (See Plaintiff's Exhibit ["Pl. Exh."] 4.)  At one point, Wilks walked over to where Jones was seated.  (Id. at 10:48.)  Again, words were exchanged, and Taylor told them to stop talking.  (6/7/16 RT at 74; 6/8/16 RT at 60-62.)

10.  After pouring water into the two pitchers on Jones's table, Wilks went to the table behind where Jones was seated and poured water into one pitcher on that table.  He then walked to the third row of tables and poured water into one of those pitchers.  (Pl. Exh. 1 at 10:48.)

11.  Jones got up to leave the chow hall.  (6/8/16 RT at 62, 112.)  Wilks started making his way across the room towards the exit of the chow hall.  Jones began walking in the same direction.  They were separated by a row of tables.  (Pl. Exh. 1 at 10:48; Pl. Exh. 4 at 10:48.)

12.  Jones emptied his tray into the garbage can and was then supposed to return the tray to the drop off area, but he did not do so.  (Pl. Exh. 4 at 10:48:37-41; 6/8/16 RT at 113-14.)  When Wilks reached the other end of the chow hall, he turned left around the row of tables, and began walking towards Jones.  (Pl. Exh. 4 at 10:48:38-40.)  As Wilks started to pass by Jones, Jones hit Wilks in

3

the face with his tray.  (Id. at 10:48:42; 6/6/16 RT at 110; 6/8/16 RT at 65.) Wilks sustained a cut to the side of his face.  (Joint Exhibit ["Jt. Exh."] 131.) Jones then punched Wilks in the face, and attempted to hit him a second time, but missed.  (6/8/16 RT at 116.)  Wilks had a water pitcher in each hand and was unable to defend himself.  He ducked and ran away from Jones.  (Pl. Exh. 4 at 10:48.)

13.    At trial, Jones claimed that he was acting in self-defense and that he feared Wilks was going to hit him.  (6/8/16 RT at 64-65, 114-17.)  The Court finds Jones's testimony on this point unpersuasive in light of the surveillance video. Although the Court generally found Jones credible, it did not find his testimony credible on certain key aspects, particularly where his testimony was contradicted by the surveillance video.  The surveillance video of the incident shows Wilks never raised his pitchers towards Jones and did not anticipate being struck in the face.

14.    In response to the altercation, Deputy Mark Feduska ("Feduska") was the first to arrive.  He brushed passed Wilks (Pl. Exh. 4 at 10:48:44-45; 6/6/16 RT at 136-37) and used his momentum to take Jones down to the ground.  (AF at ¶ 10; 6/6/16 RT at 112.)  Feduska took Jones down on his stomach or "mid-torso."  (6/6/16 RT at 113, 138.)

15.    As Feduska was taking Jones to the ground, Deputies Taylor and Ryan Jablonski ("Jablonski") were making their way over to assist.  They arrived close in time (see Pl. Exh. 4 at 10:48:49-51) and both testified that Jones was resisting attempts to secure him.  (6/7/16 RT at 18, 20, 79; see also 6/6/16 RT at 115-16.)  Taylor left his position in the chow hall and immediately made his way to Jones, passing Wilks.  (Pl. Exh. 4 at 10:48:49.)  He initially unholstered his Taser, but put it away and slowed down his progress as he approached Jones and Feduska.  (Pl. Exh. 4 at 10:48:48; 6/7/16 RT at 77-78.)  The Court finds Taylor's testimony that he initially thought the altercation may have been

4

between Jones and a deputy to be inconsistent with the surveillance video. (See 6/7/16 RT at 116-17, 123-25.)

16. Jablonski also initially unholstered his Taser, but put it away as he approached Jones, believing that they would be able to get control of him quickly. (Pl. Exh. 4 at 10:48:49; 6/7/16 RT at 40.) Jablonski kneeled on Jones's right side and attempted to gain control of his arms. (6/7/16 RT at 20-21, 40.) He testified that he did not see the need to deploy knee strikes. (6/7/16 RT at 19-20.) At some point during the struggle, he got on top of Jones's upper back. (AF at ¶11.)

17. Taylor initially put his left foot on Jones's shoulder area, then brought his right foot down onto Jones's torso. (Pl. Exh. 4 at 10:48: 52-53; 6/7/16 RT at 79-81, 120-21.) Taylor heard repeated commands to Jones to give up his hands. (6/7/16 RT at 83, 95.) Approximately 10 seconds after Feduska first made contact with Jones, Taylor delivered five targeted full-force knee strikes to the back of Jones's head or the base of his neck. (AF at ¶12; Pl. Exh. 4 at 10:48:55; 6/7/16 RT at 87, 93-94; 6/8/16 RT at 73-74.)

18. It is unclear from the surveillance video where the knee strikes hit Jones. Taylor testified that he delivered the knee strikes to the base of the neck, and did not deliver knee strikes to the back of the head. (6/7/16 RT at 58, 93-94.) Jones testified that the first impact was to the back of his head, and then he described rolling his head from side to side to protect himself from the other impacts. (6/8/16 RT at 73-74.) None of the other deputies involved in the incident saw Taylor's knee strikes. (6/6/16 RT at 116-17, 173, 207-08, 211; 6/7/16 RT at 19.)

19. Although the Court largely finds the other inmates deposed in this case to be not credible because their testimony is contradicted by other evidence, including the surveillance video, the Court notes that two inmates stated during their depositions that Taylor delivered knee strikes to the back of Jones's head.

5

(Pl. Exh. 417, Deposition of Jesus Pulido, at 15:24-16:15; Pl. Exh. 413, Deposition of Willie Kelly at 11:3-10, 21:3-14.)

20.   Jones's biomechanical expert, Dr. Jesse Wobrock ("Wobrock"), reviewed the surveillance video, the inmate grievance report, the inmate discipline report, injury photographs, the expert reports of Richard Lichten ("Lichten") and Dr. Tack Lam ("Lam"), medical records, the Complaint, and deposition testimony. (Pl. Exh. 502 at 1-2; 6/6/16 RT at 61.)  He opined that Taylor was positioned directly over Jones's head area when the knee strikes were imposed; Jones sustained multiple facial injuries, which were consistent with multiple blows to the back of his head and were not the result of a single fall; there was no indication that Taylor accidentally delivered any of the blows to the back of Jones's head; and there were no significant injuries to Jones's upper back, which was inconsistent with Taylor's testimony that the knee strikes were to Jones's back.  (Pl. Exh. 502 at 13-15; 6/6/16 RT at 62-67, 80.)

21.   Based on his review of the evidence, defendants' expert, Robert Fonzi ("Fonzi"), concluded that there was no physical evidence that Taylor delivered any knee strikes to the back of Jones's head and that Taylor used reasonable force during the incident.  (Def. Exh. 503 at 5; 6/15/16 RT at 12.)  Fonzi reviewed the Complaint, Answer, crime report, surveillance video, photographs, recorded statements, inmate roster sheet, inmate discipline report, the County's responses to discovery, medical treatment policies, medical records, the Taser printout, the initial disclosures, deposition testimony, use of force policies and procedures, and P.O.S.T. training.  (Def. Exh. 503 at 3; 6/8/16 RT at 242-43.)

22.   The Court need not resolve whether the knee strikes were to the back of Jones's head or the base of the neck, as it otherwise finds that the force used was not reasonable, as the force was potentially lethal, and that Jones was injured as a result of Taylor's actions.

23. Pursuant to the San Bernardino County Sheriff's Department's use of force policy, "[d]eputies shall use only that amount of force that reasonably appears necessary, given the facts and circumstances perceived by the deputy at the time of the event, to accomplish legitimate law enforcement purpose." The policy provides that the "reasonableness" of the force used "must be judged from the perspective of a reasonable deputy on the scene at the time of the incident." Factors relevant in determining whether a deputy used reasonable force include: (1) The seriousness of the suspected offense or reason for the contact; (2) the behavior of the individual being confronted; (3) the age, size, relative strength, skill level, and number of subjects versus deputies; (4) the level of injury and/or exhaustion of the deputy; (5) the level of drug/alcohol influence exhibited by the subjects involved; (6) the proximity or availability of weapons; (7) the availability of options; (8) the training and experience of the deputy; (9) the potential for injury to citizens, deputy, and suspects; (10) the risk of escape; and (11) the existence of other exigencies. (Pl. Exh. 215)

24. Pursuant to Learning Domain 33, Principles of Defensive Tactics, injuries to the skull can result in death; injuries to the neck area may cause damage to the central nervous system, and injuries to the spine can result in partial or complete paralysis. (Pl. Exh. 509.) Deputies are trained to deliver knee strikes to the shoulder, side of the torso, and large muscle groups. (6/6/16 RT at 198; 6/8/16 RT 241-42.) Fonzi testified that the head, neck, and spine are areas in which they do not deliver knee strikes. (6/15/16 RT at 43.)

25. Knee strikes to the head or spine are potentially deadly force (6/7/16 RT at 160, 206-07) and knee strikes to the head or upper neck spine area are outside policy. (6/15/16 RT at 9, 46-48.)

26. Deputies are trained not to let an inmate's head hit the concrete floor because it could kill someone. (See 6/6/16 RT at 197-98.)

/ / /

7

27. Although Jones did not attempt to strike the deputies and there is no evidence that Jones had any weapons during the struggle on the ground, throughout the incident, he passively resisted the deputies' orders to give up his hands. (See 6/6/16 RT at 115, 149, 210, 223-24; 6/7/16 RT 18, 42, 126-27; 6/8/16 RT at 71-72.) The deputies repeatedly told Jones to stop resisting and to give up his hands, which he failed to do. (6/6/16 RT at 142-44; 6/7/16 RT at 42.) The Court does not find Jones credible to the extent that he testified that he did not resist and immediately complied with Feduska's orders. (6/8/16 RT at 65-68, 73.) Deputies testified that Jones continued to resist and the surveillance video shows the deputies continuing to struggle with Jones. Although at one point in the surveillance video, at approximately 10:49 a.m. and 15 seconds, it appears that Jones's right arm was behind his back, the deputies continued to struggle for Jones's other arm. (Pl. Exh. 4 at 10:49:15; 6/6/16 RT at 122; 6/7/16 RT at 22, 37.) Jablonski suffered a broken finger during the struggle. (6/7/16 RT at 39.)

28. After securing Wilks, Deputy Allen Hluchan ("Hluchan") arrived to assist. (AR at ¶13; Pl. Exh. 4 at 10:49:13; 6/6/16 RT at 168, 170-71.) Because Jones continued to resist by not presenting one or both hands, Jablonski removed his Taser and attempted to tase Jones, firing darts into Jones's back. (Pl. Exh. 4 at 10:49:18; 6/7/16 RT at 22, 27, 32-34, 45.) Jones did not react, most likely because of the close range of the darts. (6/6/16 RT at 144, 213; 6/7/16 RT at 33, 44; 6/15/16 RT at 15-16.) Jones continued to resist. (6/6/16 RT at 144, 213, 222-23; 6/7/16 RT at 33.)

29. Another deputy, Tony Acosta ("Acosta"), was standing nearby, monitoring other inmates in the chow hall. He testified that he did not see any of the other inmates attempt to get involved. (AR at ¶14; 6/6/16 RT at 212.) From his position, Acosta saw that the initial tase did not have any effect on Jones. (6/6/16 RT at 213.) He suggested to Jablonski that he drive stun Jones by

placing the Taser on his leg.  (Pl. Exh. 4 at 10:49:22; 6/6/16 RT at 213, 222-23.)

30.   Jablonski then drive stunned Jones, and Jones released both hands and Hluchan was able to handcuff him.  (AR at ¶13; 6/6/16 RT at 143-44, 213-14, 222.)

31.   Pursuant to the San Bernardino County Sheriff's Department's policy on Tasers, use shall be in accordance with the use of force policy, and Tasers may not be used as a means or method of punishment.  Generally, the Taser should not be used "[w]hen subjects are handcuffed or otherwise restrained, absent overtly assaultive behavior that cannot be reasonably overcome by any other less intrusive manner."  (Pl. Exh. 215 at 11, 13.)

32.   Jones's liability expert, Lichten, initially concluded that Jablonski's use of the Taser was within policy.  (Pl. Exh. 501 at 5; 6/8/16 RT at 150.)   He later modified his opinion after reviewing the enhanced surveillance video (Pl. Exh. 4) and found that "in all probability," Jones was handcuffed at the time he was shot with the Taser and then drive stunned and therefore, the use of the Taser was unreasonable, excessive, and out of policy.  (Pl. Exh. 506 at 1; 6/8/16 RT at 150, 154.)  Based on the surveillance video, the Court concludes that Jones has not met his burden of demonstrating that he was already handcuffed when he was tased.  The surveillance video shows that Hluchan bent over to attempt to handcuff Jones at 10:49 a.m. and 15 seconds.  (Pl. Exh. 4 at 10:49:15.)  He stood up at 10:49 a.m. and 34 seconds.  He testified that he stood up right after handcuffing Jones.  (6/6/16 RT at 190.)   The surveillance video shows Jablonski drive stunned Jones in the leg at approximately 10:49 a.m. and 25 seconds, before Jones was handcuffed.  (Pl. Exh. 4 at 10:49:25; see also Pl. Exh. 201; 6/7/16 RT at 36-37, 42.)

33.   Once handcuffed, Jones was lifted up and taken to the infirmary.  The entire incident, from the time Feduska made contact with Jones to the point where Jones was handcuffed, took less than a minute.  (See Pl. Exhs. 1, 4.)

34. After the incident, Jones's face was covered with blood and a pool of blood could be seen on the surveillance video. (Pl. Exh. 4 at 10:49:50; Pl. Exh. 143; 6/6/16 RT at 185.) Jones's face was cleaned and then photographs were taken, although Jones requested that the photographs be taken prior to the cleaning. (Pl. Exh. 205 at 2-3, 9-10; 6/8/16 RT at 79.)  Jones testified that he was in extreme pain at this time. (6/8/16 RT at 83.)

35. Jones was taken to Arrowhead Regional Medical Center ("ARMC") for treatment. (See AF at ¶15.)

36. Jones suffered a six to seven centimeter laceration above his right eye, which was sutured at ARMC, resulting in a scar. (See Pl. Exh. 101; Pl. Exh. 301 at 25, 35; Jt. Exh. 303 at 26; 6/8/16 RT at 89.)  Fonzi opined that Jones likely suffered the laceration to his head during the initial take down, either from hitting a nearby door hinge or the concrete floor. (6/15/16 RT at 12-13.) Feduska, however, testified that he did not drive Jones's head into the concrete, Jones did not land on his head, and he did not hear Jones's head hit the floor. (6/6/16 RT at 112, 138.)  Jones testified that he did not hit his head when he initially went down or hit it on the door hinge. (6/8/16 RT at 70-71.) Although the floor was slippery from the water in Wilks's pitchers, Jones testified that there was no water where he went down and he did not slip. (6/6/16 RT at 114; 6/7/16 RT at 123; 6/8/16 RT at 68-69.)  In light of this evidence, the Court finds Fonzi's testimony unpersuasive.  The Court finds that the overall evidence showed that Jones was injured as a result of Taylor's actions, not the initial take down.

37. CT scans were ordered at ARMC.  The CT scan of the brain was negative. (Pl. Exh. 301 at 29.)  The maxillofacial CT scan was read by radiologist, Dr. Chandler Shyu, who noted a nasal bone fracture, questionable small fracture involving the medial left orbital wall, and mild deviation of the nasal septum to the right. (Pl. Exh. 301 at 30.)  The emergency room physician diagnosed

10

Jones with a nasal fracture and possible small left medial orbital wall fracture. (Pl. Exh. 301 at 24-25.)  Jones returned to the CDC the same day.  (Pl. Exh. 301 at 23; 6/8/16 RT at 83.)

38.  Jones was treated at the CDC by Dr. Lyn Pintelon.  (See Jt. Exh. 303 at 24; 6/7/16 RT at 137-38.)  She noted that Jones had a probable concussion, possible left orbital wall fracture, and nasal fracture, and referred Jones to an oral maxillary facial surgeon.  (Jt. Exh. 303 at 24; 6/7/16 RT at 138-39.)

39.  Jones returned to ARMC on February 6, 2014 (6/8/16 RT at 84) and was seen by Dr. Ayleen Rojhani ("Rojhani"), a resident from the Loma Linda Oral and Maxillofacial Surgery Program.  Rojhani examined the CT scans and did a physical examination of Jones.  She concluded that Jones suffered a nondisplaced comminuted nasal fracture with mildly deviated septum, right maxillary sinus fracture, and nondisplaced bilateral orbital floor fractures. (Pl. Exh. 301 at 33; 6/6/16 RT at 34, 36-46, 56.)

40.  Defense expert Lam, a physician-engineer, disagreed with Rojhani's findings and concluded that Jones did not sustain multiple facial injuries.  Lam did not see any evidence of bilateral orbital floor fractures or a right maxillary sinus fracture. (Def. Exh. 504 at 3; 6/8/16 RT at 174, 182-83, 195.)  In reaching this conclusion, Lam reviewed the Complaint, uniform crime report, surveillance video, photographs, deposition testimony, medical records, and expert reports. (Defendants' Exhibit ["Def. Exh."] 504 at 2; 6/8/16 RT at 174.)  The Court finds the treating physician's testimony more persuasive.  Although Lam initially explained that the gap in the CT scans that Rojhani attributed to the orbital floor fracture was the inferior orbital nerve tunnel, on cross-examination his testimony was inconsistent as he then opined that the identified gap also could have been a bone cyst.  (6/8/16 RT at 190-93, 205-06.)  He did not sufficiently explain this discrepancy.  Rojhani, who examined

/ / /

1  Jones and was not a retained expert in this case, was in a better position to
2  evaluate Jones's injuries.

3  41.  After being released from the CDC, Jones testified that he felt disoriented and
4  sought further medical treatment at the Loma Linda Hospital. (6/8/16 RT at
5  85-86.) However, Jones left the Loma Linda Hospital before receiving medical
6  treatment and instead, received treatment at a hospital "in the mountains," the
7  Mountains Community Hospital. (Pl. Exhs. 304, 305 at 6; 6/8/16 RT at 86-88.)
8  A head CT scan done at the Mountains Community Hospital was negative. (Pl.
9  Exh. 304, Noncontrast Head CT.)

10  42.  Although Jones maintains that, as a result of the incident, his vision has
11  deteriorated, he has become paranoid, his reaction time has slowed, it has
12  affected his intelligence, he has suffered memory loss, and has headaches,
13  (6/8/16 RT at 89-92; see also Pl. Exh. 306, Health Services Request dated
14  2/27/16), Jones has not presented sufficient evidence from which the Court
15  could conclude that all of these conditions were caused by the February 2,
16  2014 incident, particularly given Jones's testimony that he has been a long time
17  methamphetamine user, which also could be the cause of many of the
18  symptoms identified. (6/8/16 RT 52-53, 96.) Indeed, Jones tested positive for
19  methamphetamine when he was treated at the Mountains Community Hospital.
20  (Pl. Exh. 304, Mountains Community Hospital Drug Screen 12 Panel; 6/8/16
21  RT at 96.)

22  43.  The only evidence from which the Court could calculate a non-speculative cost
23  for medical treatment is a bill from the Mountains Community Hospital for the
24  treatment Jones received after being released from CDC.  Those charges,
25  including charges which appear unrelated to head injuries suffered as the result
26  of Taylor's actions on February 2, 2014 (*i.e.*, EKG, chest x-ray), totaled
27  $4,905.64. (Pl. Exh. 304.)

28  ///

### III.  **Post-Incident Reports**

44.  Jablonski completed a supplemental report in which he stated that when Feduska attempted to gain control of Jones, Jones "backed up, slipped in water and fell, striking his head onto the concrete floor." (Pl. Exh. 208 at 4.) However, at trial, Jablonski testified that he did not see the initial take down. (6/7/16 RT at 17.)  He explained that he wrote that Jones slipped in water because that was his opinion based on Jones's injuries. (Id. at 30-31.)  He admitted that he went over his report with Sergeant Alvin Huff ("Huff"), but stated that no one told him to say that was how the injury occurred. (Id. at 31-32.)

45.  Feduska stated in his supplemental report that Jones sustained the laceration above his right eye from the impact on the concrete floor, even though at trial, he testified that he did not hear Jones's head hit the floor and he took him down on his stomach.  He also stated in his report that he and Taylor applied an "unknown number" of distractive knee strikes to Jones's upper torso. (Pl. Exh. 210.)  He further indicated in his report that "[d]ue to the spontaneous nature of the incident, [his] belt recorder was not activated prior to [his] involvement" with Jones. (Id.)

46.  Hluchan stated in his supplemental report that when he entered the chow hall, Jones was resisting deputies, was non-compliant, and tried to pull away from the deputies. (Pl. Exh. 211.)  At trial, he stated that he did not actually see this, and he assumed what was happening based on his observations. (6/6/16 RT at 175, 177.)

47.  In his supplemental report, Taylor stated that he delivered 3-4 distractive knee strikes towards Jones's ribcage and back, although at trial, he stated that the knee strikes were to the base of neck. (Pl. Exh. 212.)

/ / /

/ / /

48.  The Court has considered these inconsistencies in its credibility determination, finding that these deputies are not entirely credible in light of inaccurate statements in their reports.

**IV.  Post-incident Investigation and Other Evidence Regarding *Monell* Claims**

49.  Huff was the acting commanding officer who conducted the use of force investigation. (AF at ¶7.) Huff had final policymaking authority from the County to conduct the use of force investigation and to provide recommendations regarding Taylor's use of force. (Id.)

50.  Huff reviewed the surveillance video, interviewed various witnesses, including Jones, reviewed witness statements, including the deputy reports, and discussed the incident with other supervisors who had reviewed the surveillance video. (6/7/16 RT at 161-62, 188-89, 198; 6/8/16 RT 27-29; see also Pl. Exhs. 208-212.) He was not aware of the extent of Jones's injuries and according to Huff, pursuant to policy, he did not review any of the medical records. (6/7/16 RT at 163-68, 185; 6/8/16 RT at 29-30, 33.) During his second interview of Jones, Jones told him that he suffered a broken orbit, but Huff did not investigate. (6/8/16 RT at 31-32.) The use of force policy provides that use of force investigations generally shall include any documentation or evidence deemed relevant to the incident. (Pl. Exh. 215 at 3.)

51.  Huff concluded that the force used on February 2, 2014 was appropriate and within policy. (AF at ¶7.) Taylor was not disciplined. (6/7/16 RT at 83-84.)

52.  During the examination of Hluchan, Jones introduced evidence regarding a prior incident involving Hluchan. Hluchan testified that he was written-up after hitting an inmate in the face near the property room when the inmate cursed at him, ignored him, and walked away. (6/6/16 RT at 181-82.)

/ / /

14

53.     Jones also presented evidence of a grand jury report regarding the San Bernardino County Sheriff's Department Taser policies and usage, an administrative investigation regarding a tasing incident at the West Valley Detention Center, eleven lawsuits filed between 2013 and 2016 against the County of San Bernardino, involving allegations of excessive force, two of which appeared to involve the use of knee strikes, and two news articles regarding the use of force during arrest.  (Pl. Exhs. 216, 218-23, 225-32.) Although Jones also referenced an ongoing FBI investigation, no findings regarding this investigation were admitted into evidence.

## CONCLUSIONS OF LAW

### I.     Jurisdiction and Venue

1.      The Court has original jurisdiction to decide this action brought pursuant to 42 U.S.C. § 1983.  See 28 U.S.C. §§ 1331, 1343.   The Court also has supplemental jurisdiction over Jones's state law claims.  28 U.S.C. § 1367.

2.      Venue is proper because Jones's claims arise out of an incident that occurred in San Bernardino County, which is within the Central District of California. 28 U.S.C. § 1391(b).

### II.    Excessive Force under 42 U.S.C. § 1983

3.      Jones's first claim is for excessive force under the Fourteenth Amendment against Taylor.

4.      In order to prevail on his Section 1983 claim, Jones must prove that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Marsh v. County of San Diego, 680 F.3d 1148, 1152 (9th Cir. 2012) (citation omitted).

/ / /

15

5.    Here, it is undisputed that Taylor was acting under color of state law.  (AF at ¶5.)  Thus, Jones's Section 1983 claim turns on whether Taylor's conduct deprived him of his rights under the Fourteenth Amendment.

6.    A person deprives another of a constitutional right if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains.  Leer v. Murphy, 844 F.2d 628, 633 (9th Cir.1988).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  Id.

7.    The Due Process Clause protects pretrial detainees from the use of excessive force that amounts to punishment.  Graham v. Connor, 490 U.S. 386, 395 n.10, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (citing Bell v. Wolfish, 441 U.S. 520, 535-39, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) ("[U]nder the Due Process Clause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.")).

8.    In order to prove an excessive force claim under the Fourteenth Amendment, a pretrial detainee must show that "the force purposely or knowingly used against him was objectively unreasonable."  "[T]he defendant's state of mind is not a matter that a plaintiff is required to prove."  Kingsley v. Hendrickson, 576 U.S. –, 135 S. Ct. 2466, 2472-73, 192 L. Ed. 2d 416 (2015).

9.    Objective reasonableness turns on the "facts and circumstances of each particular case."  Kingsley, 135 S. Ct. at 2472-73 (citation omitted).  Courts must make this determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight" and consider the "'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail

16

officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" Id. at 2473 (alterations in original) (citations omitted).

10. Although not exclusive, the Supreme Court has identified several factors that a court may consider in determining the reasonableness or unreasonableness of the force used: (1) "[T]he relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." Kingsley, 135 S. Ct. at 2473.

11. Jones initiated a fight with Wilks in the chow hall, which is one of the most dangerous locations in the CDC. Feduska immediately responded and took Jones to the ground. Feduska then was joined by Taylor and Jablonski, after Jones was on the ground. Both Taylor and Jablonski re-holstered their Tasers before reaching Feduska and Jones, which the Court finds relevant to the extent of the perceived threat. The surveillance video also shows that as Taylor approached, he slowed down, providing him additional time to assess the situation and the extent of potential threat.

12. Jones passively resisted the deputies, ignored orders to stop resisting, and refused to produce his hands for handcuffing. However, he had no weapons, he was surrounded by three deputies, with additional deputies nearby, and he was already on the ground. He made no effort to hit or kick the deputies and his actions were not life threatening to the deputies involved. See Nelson v. City of Davis, 685 F.3d 867, 881 (9th Cir. 2012) ("[A] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force.").

13. Upon reaching Jones, Taylor immediately put his left foot on Jones's shoulder and put his right foot on his back. He then proceeded to inflict five knee

17

strikes to either the back of the Jones's head or the base of his neck. Knee strikes are considered a significant use of force. See Lopez v. City of Imperial, 2015 WL 4077635, at *7 (S.D. Cal. July 2, 2015); Aranda v. City of McMinnville, 942 F. Supp. 2d 1096, 1105 (D. Or. 2013) (using closed fist and knee to deliver multiple focused blows to the plaintiff's head, shoulder, and side a significant use of force). While using knee strikes to distract an inmate may be a less significant use of force depending on the circumstances, a deputy striking an inmate five times with full force in the back of the head or at the base of the neck is excessive when considering Jones's passive resistence.

14.   As explained, pursuant to Learning Domain 33, Principles of Defensive Tactics, injuries to the skull can result in death; injuries to the neck area may cause damage to the central nervous system, and injuries to the spine can result in partial or complete paralysis. (Pl. Exh. 509.)

15.   As a result of Taylor's actions, Jones suffered several broken bones in his face, and a significant laceration above his right eye.

16.   Although the Court is mindful of the need to gain control over the situation as quickly as possible in light of the location of the altercation, there was no evidence presented that any other inmates made any effort to get involved or that the initial altercation with Wilks was merely a distraction in a larger plan to attack the deputies or riot.

17.   Accordingly, the Court finds that the totality of the circumstances establish that Taylor's use of force was unreasonable, unnecessary, and excessive.

18.   Having carefully considered the facts and circumstances of this case, the Court finds that Jones has successfully established by a preponderance of the evidence that Taylor used excessive force in the course of the February 2, 2014 incident in violation of the Fourteenth Amendment.

///

///

### III.  Qualified Immunity

19.  Taylor argues that, even if the Court finds him liable under Section 1983, he is entitled to qualified immunity.

20.  An officer is entitled to qualified immunity on an excessive force claim unless he has violated a "clearly established" right, such that "it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Kingsley, 135 S. Ct. at 2474 (alteration in original) (citation omitted); Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (explaining that the doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (citation omitted)).

21.  In determining whether an officer is entitled to qualified immunity, courts consider (1) whether "'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009)).

22.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Mullenix v. Luna, 577 U.S. –, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

23.  The Court has determined that Jones established by the preponderance of the evidence that Taylor's conduct violated a constitutional right.  Therefore, the Court turns to step two in the analysis.

24.  A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Mullenix, 136 S. Ct. at 308 (quoting Reichle v. Howards, 566 U.S. –,

132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012)).  The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al–Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011).  The relevant question is "whether the violative nature of *particular* conduct is clearly established."  Mullenix, 136 S. Ct. at 308 (citation omitted).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam) (citation omitted).

25. The Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). In assessing the reasonableness of an officer's conduct, the relevant inquiry is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his conduct was unconstitutional. Id.; see also Boyd v. Benton County, 374 F.3d 773, 781 (9th Cir. 2004) ("In excessive force cases, the inquiry remains whether, 'under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable.'" (alteration in original) (quoting Drummond v. City of Anaheim, 343 F.3d 1052, 1060 (9th Cir. 2003)).

26. Courts should be careful "to apply the clearly established rule in such a way that faithfully guards the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (en banc) (internal quotation marks and citations omitted).

27. The Ninth Circuit has found that the "right to be free from application of non-trivial force for engaging in mere passive resistance was clearly established

prior to 2008." Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013); see also Nelson, 685 F.3d at 881 (citing cases dating back to 2002 recognizing that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"); Blankenhorn v. City of Orange, 485 F.3d 463, 478-81 (9th Cir. 2007) (a prudent officer was on notice that gang-tackling a suspect who refused to comply with an officer's order to kneel down to be handcuffed, but did not actively resist arrest was a violation of that person's Fourth Amendment rights); Lopez, 2015 WL 4077635, at *19 (at the time of the plaintiff's arrest in 2012, the law clearly established that knee strikes, which constitute intermediate force, against an noncompliant arrestee can be excessive). Thus, at the time of the incident, a reasonable officer in Taylor's position would have known that delivering multiple knee strikes to the head or base of the neck of a passively resisting pretrial detainee constituted excessive force. See Davis v. City of Las Vegas, 478 F.3d 1048, 1057 (9th Cir. 2007) (any reasonable officer would have known that swinging a handcuffed man into a wall head-first multiple times and then punching him in the face while he lay face down on the ground, breaking his neck, was unnecessary and excessive); see also Aranda, 942 F. Supp. 2d at 1108-09 (defendant not entitled to qualified immunity where he was "on notice as to the legality of using 'focused blows' to arrest a non-combative individual whose only apparent crime was minimal resistance to arrest").

28.   As such, Taylor is not entitled to qualified immunity.

## IV.   _**Monell**_ **liability**

29.   Jones also alleges that the County and McMahon are liable for adopting a custom of using excessive force, inconsistently applying the use of force policy, failing to train deputies, and ratifying Taylor's conduct.

30.  A local government entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Thus, a local government may be liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers," or if the alleged constitutional deprivation was "visited pursuant to a governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." See id. at 690-91.

31.  As explained above, the Court finds that Jones has demonstrated that Taylor violated his constitutional rights.  However, the Court finds that Jones has failed to demonstrate that Jablonski's use of the Taser was unreasonable under the circumstances and that Jones was handcuffed at the time that he was tased.  Thus, the Court finds no constitutional violation with respect to Jablonski's conduct for purposes of Monell liability.

A.  Custom and practice of using excessive force towards retrained or subdued detainees

32.  To impose municipal liability under Section 1983 based on a policy or custom, Jones must show that: (1) He possessed a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to his constitutional rights; and (4) the policy was the moving force behind the constitutional violation. Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011) (citing Plumeau v. Sch. Dist. No. 40 Cnty.

22

of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997)).  There must be "a direct causal link" between the policy or custom and the alleged constitutional deprivation. Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 957 (9th Cir. 2008) (en banc) (citation omitted).

33.  "[A] plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) (plurality opinion) (citation omitted); McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000) ("Only if a plaintiff shows that his injury resulted from a 'permanent and well settled' practice may liability attach for injury resulting from a local government custom." (citation omitted)).

34.  A plaintiff "may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded," Gillette v. Delmore, 979 F.2d 1342, 1349 (9th Cir. 1992) (per curiam), although evidence of random or isolated incidents are insufficient to demonstrate a custom. Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996); Thompson v. City of Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir.1989), overruled on other grounds by Bull v. City & County of San Francisco, 595 F.3d 964 (9th Cir. 2010) (en banc); see also Christie v. Iopa, 176 F.3d 1231, 1235 (9th Cir. 1999).

35.  Here, Jones contends that there exists a culture of excessive force used against restrained or subdued detainees by the sheriff's department.  In support of his contention, Jones appears to rely on civil rights actions filed between 2013 and 2016, a grand jury report regarding the San Bernardino County Sheriff's Department Taser policies and usage, an administrative investigation regarding a tasing incident at the West Valley Detention Center, and two news articles regarding the use of force during arrest.  (Pl. Exhs. 216, 218-23, 225-32.)

23

36.    The Court finds such evidence insufficient to establish a "persistent and widespread" practice of using excessive force towards pretrial detainees who are restrained or subdued such that it constitutes "permanent and well settled" policy, Haynes v. City & County of San Francisco, 2010 WL 2991732 at *4 (N.D. Cal. July 28, 2010) ("providing evidence of past complaints against officers is generally insufficient to establish a policy or custom of indifference"); Maestrini v. City & County of San Francisco, 2009 WL 814510, at *11 (N.D. Cal. Mar. 26, 2009) ("Plaintiff cannot prove deliberate indifference through unsubstantiated hearsay complaints.  A list of prior complaints against an officer, without more, is insufficient to create a trial issue of fact regarding a municipality's policy of inadequately investigating or disciplining its officers"); Davis v. Clearlake Police Dep't, 2008 WL 4104344 at *8 (N.D. Cal. Sept. 3, 2008) (the filing of five federal lawsuits against a city insufficient to show policy or practice of racial discrimination); Hocking v. City of Roseville, 2008 WL 1808250, at *5 (E.D. Cal. April 22, 2008) ("Statistics of unsustained complaints of excessive force and other police misconduct, without any evidence that those complaints had merit, does not suffice to establish municipal liability under § 1983."); see also McArthur v. City & County of San Francesco, 2016 WL 3136907, at *7 (N.D. Cal. June 6, 2016) (citing Haynes), let alone sufficient to establish that such custom was the moving force behind the constitutional violation.

37.    "When one must resort to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom." Trevino, 99 F.3d at 920.  The record is virtually devoid of any direct evidence that sheriff deputies actually violated the constitutional rights of other detainees by the use of excessive force or unreasonably used knee strikes.  Instead, Jones primarily relies on the mere investigation and filing of lawsuits to demonstrate a custom

24

of excessive force, without presenting evidence regarding the outcome of these lawsuits.

38. Accordingly, Jones has failed to demonstrate <u>Monell</u> liability based on a custom and practice of using excessive force towards restrained or subdued detainees.

B. <u>Failure to consistently apply use of force policy</u>

39. "[A] plaintiff can allege that through its *omissions* the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." <u>Gibson v. County of Washoe</u>, 290 F.3d 1175, 1186 (9th Cir. 2002) (emphasis in original). The plaintiff must show that the municipality's deliberate indifference "led to its omission and that the omission caused the employee to commit the constitutional violation." To demonstrate deliberate indifference, the plaintiff must show that the municipality was on "actual or constructive notice that its omission would likely result in a constitutional violation." <u>Id.</u>

40. Jones maintains that the County's failure to consistently apply its use of force policy constituted an "omission."

41. Jones has not cited to any authority supporting his claim that the County may be held liable based on such a theory of omission and the Court finds Jones's theory unpersuasive. Jones's reliance on an inconsistent understanding of the use of force policy is insufficient to hold the County liability based on an "omission." There is no evidence that the County was on notice of this inconsistent understanding, let alone that its deliberate indifference led to this "omission." The only evidence of the actual application of the use of force

25

policy was the incident at issue, and an incident involving Hluchan.  The two incidents were factually distinct, and thus, do not establish the inconsistent application of the use of force policy.

42.   Accordingly, Jones has failed to demonstrate <u>Monell</u> liability based on the inconsistent application of the use of force policy.

C. <u>Failure to train staff in the use of proper force towards restrained or subdued detainees</u>

43.   To establish municipal liability based on the failure to train, Jones must show that: (1) He was deprived of a constitutional right, (2) the County had a training policy that "'amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its officers] are likely to come into contact"; and (3) his injury would have been avoided had the County properly trained its officers.  <u>Blankenhorn</u>, 485 F.3d at 484 (citation omitted).

44.   Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." <u>Connick v. Thompson</u>, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) (citation omitted).   Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary to show deliberate indifference. <u>Id.</u> at 62.

45.   "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action–the "deliberate indifference"–necessary to trigger municipal liability.'" <u>Connick</u>, 563 U.S. at 62 (citation omitted).

46.   Jones argues that the County had a custom of failing to properly train its deputies in the proper use of force when apprehending subdued or proned-out detainees.

26

47. The Court finds that Jones has not demonstrated that the County and/or McMahon disregarded a known or obvious consequence that a particular omission in their training program would cause constitutional violations. Connick, 563 U.S. at 61. Evidence was produced regarding a detailed use of force policy, including training regarding the potential injuries that may result.

48. Jones's reliance on other complaints of excessive force is insufficient to demonstrate that the use of force policy was inadequate, that the County was deliberately indifferent, or that the inadequacy of the use of force policy was the moving force behind the constitutional violation. Jones did not provide any evidence regarding the results of those cases or whether constitutional violations were ultimately found.

49. Accordingly, Jones has failed to demonstrate Monell liability based on the failure to train staff in the use of proper force towards restrained or subdued detainees.


    D. Ratification of Taylor's conduct

50. A municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions. Lytle v. Carl, 382 F.3d 978, 987 (9th Cir. 2004); see also Clouthier v. County of Contra Costa, 591 F.3d 1232, 1250 (9th Cir. 2010) (explaining that a local government entity may be held liable when an individual with final policy-making authority ratifies a subordinate's unconstitutional decision or action and the basis for it). To show ratification, the plaintiff must show that the final policymaker made a deliberate choice from among various alternatives to follow a particular course of action. Gillette, 979 F.2d at 1348. "The policymaker must have knowledge of the constitutional violation and actually approve it." Lytle, 382 F.3d at 987. "A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." Id.

27

51.  Jones maintains that Huff ratified Taylor's conduct by standing behind Taylor's actions claiming that his conduct was pursuant to policy.

52.  Courts in the Ninth Circuit "have stopped short of holding that a plaintiff can prove Monell liability simply on the basis of a defendant department's post-incident ratification through failure to discipline or take other action concerning the officer directly involved." Mueller v. Cruz, 2015 WL 9455565, at *3 (C.D. Dec. 23, 2015); see also Sheehan v. Bay Area Rapid Transit, 2016 WL 777784, at *13-14 (N.D. Cal. Feb. 29, 2016); Kong Meng Xiong v. City of Merced, 2015 WL 4598861, at *30 (E.D. Cal. Jul. 29, 2015) (failure to impose any discipline or modify the recommendation is insufficient in-and-of-itself to establish Monell liability; there must be "something more"); Garcia v. City of Imperial, 2010 WL 3911457, at *2 (S.D. Cal. Oct. 4, 2010) (explaining that "there must be 'something more' than a single failure to discipline or the fact that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures").

53.  Even assuming that Huff may not have considered certain evidence, or considered some evidence more relevant than other evidence, Jones did not present any expert testimony demonstrating that the investigation was improper or that any shortcomings in the investigation were sufficiently material to demonstrate ratification.  Cf. Larez v. City of Los Angeles, 946 F.2d 630, 647 (9th Cir. 1991) (as amended) (considering expert testimony that investigation was procedurally improper); see also Azevedo v. City of Fresno, 2010 WL 2353526, at *22 (E.D. Cal. June 9, 2010) (concluding that in the absence of expert testimony, the plaintiff had not adequately shown that the shortcomings in the investigation were sufficiently material or would have been readily visible to a reasonable administrator for purposes of supporting a ratification theory), corrected by 2010 WL 2599007 (E.D. Cal. June 18, 2010).

/ / /

54. Accordingly, the Court finds Jones has not established <u>Monell</u> liability based on ratification.

**V.   Battery**

55. Jones also alleges that Taylor committed battery.

56. Under California law, the essential elements of a cause of action for battery are: "(1) [D]efendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching." <u>Yun Hee So v. Sook Ja Shin</u>, 212 Cal. App. 4th 652, 669, 151 Cal. Rptr. 3d 257 (2013) (as modified).

57. A state law battery claim is a counterpart to a federal claim of excessive use of force. <u>Brown v. Ransweiler</u>, 171 Cal. App. 4th 516, 527, 89 Cal. Rptr. 3d 801 (2009); <u>see also</u> <u>Harding v. City & County of San Francisco</u>, 602 F. App'x 380, 384 (9th Cir. 2015) (a California law battery claim is a "counterpart" to a federal excessive force claim).

58. As explained above, Taylor's actions were not objectively reasonable.  Taylor used excessive and unnecessary force by knee striking Jones in the back of the head or at the base of the neck.  Jones clearly did not consent to this contact, and the use of excessive force caused injury and damages to Jones.

59. Accordingly, Taylor is liable on Jones's battery claim.

**VI.   Negligence**

60. Jones further alleges that he was harmed by Taylor's negligence.

61. Under California law, the elements of a cause of action for negligence are: "(1) [D]efendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform

to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." <u>Corales v. Bennett</u>, 567 F.3d 554, 572 (9th Cir. 2009) (citation omitted).

62. "[T]here is a special relationship between jailer and prisoner which imposes a duty of care on the jailer to the prisoner." <u>Giraldo v. Cal. Dep't of Corr. & Rehab.</u>, 168 Cal. App. 4th 231, 252-53, 85 Cal. Rptr. 3d 371 (2008). This duty to protect inmates extends only "to reasonably foreseeable harm." <u>Harding</u>, 602 F. App'x at 383.

63. As discussed above, the Court finds that Taylor's knee strikes were excessive and unnecessary. As Huff testified, knee strikes to the head or spine are potentially deadly force. (6/7/16 RT at 160, 206-07.) Given Jones's passive resistence, the Court finds Taylor did not use reasonable care in deciding to use such force, and therefore, breached his duty to Jones.

64. The Court further concludes that Jones's injuries were proximately caused by this breach.

65. Accordingly, Jones has established that Taylor is liable on his negligence claim.

## VII.  Compensatory Damages

66. A plaintiff who establishes liability under 42 U.S.C. § 1983 is entitled to recover compensatory damages for the injuries suffered as a result of the constitutional violation, including for economic harm, pain and suffering, and mental and emotional distress. <u>Borunda v. Richmond</u>, 885 F.2d 1384, 1389 (9th Cir. 1989) (as amended).

67. Since the state claims are based on the same facts as his Fourteenth Amendment claim and seek identical relief, Jones is entitled to only one damages award. <u>See</u> <u>EEOC v. Waffle House, Inc.</u>, 534 U.S. 279, 297, 122 S.

Ct. 754, 151 L. Ed. 2d 755 (2002) ("it 'goes without saying that the courts can and should preclude double recovery by an individual'" (citation omitted)); Medina v. District of Columbia, 643 F.3d 323, 326 (D.C. Cir. 2011) ("[I]f a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery." (citation omitted)); Clappier v. Flynn, 605 F.2d 519, 529, 531 (10th Cir. 1979) ("[A] plaintiff is not entitled to a separate compensatory damage award under each legal theory.").

68.  The Court finds that $45,000.00 is sufficient to compensate Jones for the harm suffered as a result of Taylor's violation of his Fourteenth Amendment rights. Because comparative fault is inapplicable on Section 1983 claim, the Court declines to consider whether Jones's own conduct contributed to his harm. See Clappier, 605 F.3d at 530; Miller v. Schmitz, 2013 WL 5754945, at *5 (E.D. Cal. Oct. 23, 2013) ("Concepts of comparative fault or indemnification are not applicable in actions filed under 42 U.S.C. § 1983."); Logan v. City of Pullman Police Dep't, 2006 WL 994759, at *2 (E.D. Wash. Apr. 14, 2006).

## CONCLUSION

For the reasons stated above, the Court finds in favor of Jones on his Fourteenth Amendment, battery, and negligence claims.   The Court awards compensatory damages in the amount of $45,000.00 on Jones's Fourteenth Amendment claim.  The Court finds in favor of McMahon and the County on the Monell claims.

DATED: August 17, 2016

_____
DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE

31